UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ALEX SAPIR, 260-261 MADISON AVENUE LLC
AND SFM REALTY CORP.,

                              *Plaintiffs,*

    -against-

ROTEM ROSEN, OMER ROSEN AND JOHN AND
JANE DOE 1-100,

                              *Defendants.*
----------------------------------------------------------------X

Case No.: 20-cv-06191 (RA) (JLC)

**AMENDED
<u>COMPLAINT</u>**

      Plaintiffs Alex Sapir ("Alex"), 260-261 Madison Avenue LLC ("260-261 Madison") and

SFM Realty Corp. ("SFM") (collectively, "Plaintiffs"), by their attorneys, Oved & Oved LLP,

complaining of the Defendants, Omer Rosen ("Omer") and Rotem Rosen ("Rotem")

(collectively, "Defendants" or the "Rosens"), set forth and allege as follows, upon information

and belief:

<u>NATURE OF ACTION</u>

      1.    Alex is President and CEO of the Sapir Organization, a family-owned

organization that owns and operates a diverse, multistate real estate portfolio, founded by his

now deceased father Tamir Sapir ("Tamir").

      2.    In 2007, Rotem met and married Alex's sister, Zina Sapir ("Zina"). After losing

two jobs in two years, Rotem approached his brother-in-law, Alex, looking for an opportunity in

his wife's family's company. Over the next several years, Rotem gradually insinuated himself

into increasing control of the Sapir Organization, beginning with performing contract advisory

work and ending up holding himself out to third parties as its CEO. During this period, Rotem

collected tens of millions of dollars in compensation and eventually obtained tens of millions

more by arranging membership and ownership interests for himself in several assets and

companies, all without investing or contributing a dime of his own money. Rotem furthered his schemes by installing his own family members into sensitive positions within the Sapir Organization, bringing in his brother Omer as General Counsel and his brother Tom as head of development and acquisitions.

3.      The Rosen brothers, acting both separately and in concert, committed numerous wrongs against Plaintiffs to enrich themselves at Plaintiffs' expense. This action seeks redress for three discrete aspects of the Rosens' overall scheme to defraud and damage Plaintiffs and their affiliates while misappropriating their property and converting it to the Rosens' own use.

4.      The first is to recover damages and attorneys' fees and obtain injunctive and equitable relief in connection with Rotem's blatant breach of: (i) a broad general release he signed in consideration of a $75 Million buyout he extracted from Alex in order to separate him from the Sapir Organization (the "Mutual Release"); (ii) the terms of the limited liability company operating agreement he executed for an entity known as ASRR, LLC ("ASRR"); and (iii) the terms of a certain binding term sheet he executed in connection with the winding down of ASRR's assets and liabilities (the "Binding Term Sheet"). Rotem breached all of these contracts by, or in furtherance of, a filing of a frivolous claim against the estate of Alex's father for $103 Million in an attempt to further enrich himself at the expense of the Sapir family, gain leverage in his divorce with Zina, and create a platform to publicize confidential and/or disparaging information about the Sapir family.

5.      The second is to recover damages against Omer for breach of fiduciary duty, acting as a faithless servant, and fraud by inducing 260-261 Madison, a Sapir Organization entity, to issue Omer a $580,000 loan based on false pretenses, all while purporting to act as its

attorney; and for breach of fiduciary duty and negligent misrepresentation committed by Omer in his capacity as General Counsel to the various Sapir Organization entities.

6.      The third is to recover damages and injunctive relief based on: (i) the theft and misappropriation by Omer of over 1,500 documents constituting Plaintiffs' confidential, proprietary and trade secret information stored on his employer's private and secure server in violation of the Defend Trade Secrets Act, his duties of loyalty and good faith, the terms of his position with the Sapir Organization and in breach of the confidentiality agreements he executed with his employer, SFM; (ii) the post-Mutual Release use by Rotem of Plaintiffs' confidential, proprietary and trade secret information which he knew or had reason to know was unlawfully obtained, in violation of the Defend Trade Secrets Act; and (iii) the post-Mutual Release unfair competition by Rotem by engaging in the bad faith misappropriation of Plaintiffs' proprietary, confidential and trade secret information to compete with Plaintiffs.

## PARTIES

7.      Plaintiff Alex Sapir is a natural person who resides in Florida.  He is the President and CEO of the Sapir Organization, a group of privately-held companies majority owned and operated by members of the Sapir family.

8.      Plaintiff 260-261 Madison Avenue LLC is a Delaware limited liability company with a principal place of business located at 261 Madison Avenue, 17th Floor, New York, New York 10016.  260-261 Madison is one of the numerous and separate entities that comprise the Sapir Organization.

9.      Plaintiff SFM Realty Corp. is a New York corporation with a principal place of business located at 261 Madison Avenue, 17th Floor, New York, New York 10016.  SFM maintains the Sapir Organization's corporate offices, employs corporate-level staff, such as legal,

finance and HR, and provides management services to the entities and/or assets within the Sapir Organization.

10.    Defendant Omer Rosen is a natural person and a New York licensed attorney, who, upon information and belief, resides at 45 West 54th Street, Apt. 3B, New York, New York 10019.  Omer was employed by SFM and acted as General Counsel to the Sapir Organization from March 2012 to April 2019.

11.    Defendant Rotem Rosen is a natural person who, upon information and belief, resides at 502 Park Avenue, New York, New York 10022.  Rotem performed contract work on behalf of various entities within the Sapir Organization.

12.    Defendants John and Jane Does 1-100 are names being fictitious and unknown to Plaintiffs, who are persons or organizations who acted in concert with any of Defendants in engaging in the wrongs set forth in this Complaint.

## BACKGROUND

### A.    The Sapir Organization

13.    The Sapir Organization is a family-owned organization that owns, operates and develops real estate, and whose multistate portfolio spans multiple property classes, including commercial, residential and hospitality assets in New York and Florida.

14.    The Sapir Organization's founder, Tamir, was a self-made, first generation immigrant, who began his career in the United States as a taxicab driver.  He saw the potential in downtown Manhattan that was overlooked by others at the time and began purchasing investment properties for his family, forming Zar Realty Management in 1991 as a management and holding company.

15.     After a series of successful investments made Tamir a billionaire, he determined to build the Sapir name as a brand and began conducting business under the name The Sapir Organization instead of Zar Realty Management.

16.     By 2007, Alex and Zina were co-managing the Sapir Organization alongside their father, Tamir.

**B.     The Rosens Insinuate Themselves Into The Sapir Organization**

17.     Zina first met Rotem in early 2007, when the Sapir Organization was at its peak success and notoriety.  Zina and Rotem were married later that same year, in 2007.

18.     In 2008, Rotem was forced to leave the employ of his then employer, Africa Israel USA, where he departed under suspicious circumstances.  In 2009, after a brief stint at HFZ Capital, Rosen was terminated from there as well.

19.     In or about 2009, seeking to revive his failing career in the real estate industry, Rotem began an aggressive campaign to find himself a role within the Sapir Organization by currying favor with his brother-in-law, Alex, claiming that he had valuable contacts in the industry and special expertise in debt restructuring.  Given that Zina had stepped back from her management role to care for their child who arrived soon after her marriage to Rotem, Alex gave Rotem a chance.  By 2010, Rotem was receiving regular payments through his company, DZR Corp., for real estate advisory services.

20.     As the Great Recession took its toll on the Sapir Organization, as it did on nearly every other real estate owner/operator in the country, Rotem seized the opportunity to entrench himself even deeper in Plaintiffs' business.  He asserted opinions at every opportunity about how the family should be running its business and how Tamir should be managing his wealth and restructuring his liabilities.  Meanwhile, he began proposing to Alex that Alex partner with

Rotem to engage in new ventures together.  Rotem assured Alex that he would effectively be partnering with Zina because it would be Zina and her family who would ultimately reap the benefits of their arrangement due to their marriage.

21.     In June 2011, the partnership was formalized by the formation of ASRR.  As requested by Rotem, ASRR's operating agreement (the "Operating Agreement") reflected that each of Alex and Rotem were 50% owners of ASRR and each were Managing Members. However, the Operating Agreement contains the following key limitations:

     i.    Section 5.1.4.1 of the Operating Agreement, titled "Limitation on Authority of Members," provides that "No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member."

    ii.    Section 5.1.4.2 provides that "This Section 5.1 supersedes any authority granted to the Members pursuant to the Law."

   iii.    Section 5.1.2 of the Operating Agreement expressly provides that "no single Managing Member [may] make any decision or take any action that has the monetary effect of greater than $50,000.00 to [ASRR]."

   iv.    Section 5.1.3 of the Operating Agreement further expressly provides that "Any decision or action that must be taken on behalf of the Company that has an effect in excess of $50,000.00 shall be made jointly by both Managing Members."

22.     In sum, even though Rotem was granted a 50% "Managing Member" interest in ASRR, he had no authority to take any action whatsoever on behalf of ASRR by virtue of being a member, and he could not make any management decisions without Alex's consent, unless that action had a monetary effect to ASRR of $50,000 or less.

23.     Having achieved equal control and ownership with Alex in their new partnership, Rotem now turned to the economics.  Rotem had no money to contribute to the partnership, which was an obstacle to making investments with Alex and receiving 50% of the returns. Rotem solved this by approaching Alex's father, Tamir, and convincing Tamir that his new

partnership with Alex, ASRR, should be paid additional compensation for restructuring work that he and Alex performed over the past two years, notwithstanding that Rotem had already been paid for his services through DZR Corp.

24.    Meanwhile, Rotem also began further exploiting the implicit trust and confidence he gained by being Zina's husband to extend the reach of his control by implanting pliable allies and loyal associates at all levels of the Sapir Organization, such as Omer, Rotem's brother, who Rotem managed to install in the acutely critical and influential role of the Sapir Organization's General Counsel.  The Rosen brothers began systematically replacing members of the staff with employees of their own choosing, eventually bringing in a third brother, Tom Rosen, to head up the important development and acquisition functions of the Sapir Organization.

25.    With Zina focused on raising their family, and Tamir heading into retirement, Rotem, and Omer as General Counsel, continued to exploit the trust they had gained and their positions to enrich themselves at Plaintiffs' expense.  Rotem continually used his position as Alex's partner in ASRR to assert increasing control over all of the Sapir Organization's entities, notwithstanding that he was not an employee of the Organization, nor was he an officer, director, member or shareholder of any non-ASRR entities.  Omer, as trusted legal counsel, continually assured Alex that Rotem was acting appropriately and that his proposals were in the best interest of the Sapir Organization.

**C.    Omer's Breaches of His Fiduciary Duties as General Counsel to Enrich Himself**

26.    While Rotem plotted for more control over the Sapir Organization, Omer was engaged in a separate scheme to line his pockets with Plaintiffs' money, despite his role as their attorney.

27.     In his role as General Counsel, and based on the faith and confidence that Alex placed in him in this capacity, Omer routinely presented legal and financial documents to Alex for his signature while orally describing pertinent and material terms to Alex.  Omer would answer any questions that Alex may have had and Alex would sign the document in reliance thereon.

28.     Exploiting this relationship of trust, in or around October 2014, while still employed as the Sapir Organization's General Counsel, Omer made a request to Alex that an entity of the Sapir Organization finance Omer's purchase of a Manhattan apartment, which he wished to combine with an apartment he already owned in the same building, with a low-interest rate loan in the principal amount of $580,000.00.

29.     While discussing the proposed loan with Alex (the "Loan"), Omer stated that he would prepare documentation for the Loan on typical, commercially-reasonable terms for residential mortgages/co-op financings, with the Loan to be secured by the apartment and with a maturity date in 30 years, except that the Loan would have a low interest rate of 1.9% and Omer would only have to make payments annually, rather than monthly.  The payments would be interest only and the principal amount would be due at maturity.  Omer further represented that, like any conventional loan, if Omer failed to timely make an interest payment or otherwise default, the entire principal amount of the Loan would become immediately due and payable. Alex agreed to these terms.

30.     At no point before, during or after the negotiation of the terms of the Loan did Omer recommend or suggest that Plaintiffs retain separate counsel to review or provide advice with respect to the Loan or the terms or documentation thereof.

31.     In November 2014, Omer presented the Loan document that he had drafted to Alex, and represented that the document he prepared fully and accurately reflected all the terms to which Alex and Omer had discussed and agreed.  Consistent with the parties' relationship, Alex relied upon Omer's representations and signed the Loan document and approved funding of the Loan on or about November 12, 2014, confident that what his General Counsel was representing to him was true and correct.  It was not.

32.     Plaintiffs subsequently realized, after Omer's termination from SFM, that Omer had completely misrepresented the contents of the Loan document.  The Loan document Omer prepared for Alex to sign was nothing more than an entirely one-sided, self-serving promissory note (the "Note") wholly and utterly devoid of any of the customary terms and conditions typically found in such documents and conveniently omitting any of the terms, conditions and protections to which Omer and Alex had agreed, and which Omer expressly represented to Alex were included.

33.     Contrary to Omer's representations to Alex, the Note required no periodic payments for interest or otherwise.  It merely stated that the Loan matured thirty years later in 2044; meaning that, according to the Note Omer drafted, Omer would have absolutely no payment obligations until 2044.  In addition, contrary to Omer's direct representation to Alex, the Loan failed to include any security interest on Omer's apartment.  Thus, the Loan was entirely unsecured by any collateral – effectively nothing more than Omer's IOU.

34.     Moreover, because the Note failed to impose any periodic payment obligations or any other requirements upon Omer, the Note denied 260-261 Madison the customary ability to call the Note due and owing before it matured in 2044, even if Omer sold the apartment that was supposed to secure it or failed to make any payments on the Loan prior to the year 2044.  Thus,

not only was it merely an IOU, it was an IOU that was effectively unenforceable for 30 years. Accordingly, but for Omer's deliberate misrepresentations, Plaintiffs would not have agreed to the Loan.

35.     Tellingly, despite having no obligation to do so under the Note he drafted, Omer concealed his fraud by making the annual interest payments he had discussed with Alex every November, and it was not until independent counsel for Plaintiffs reviewed the Note years later in 2019, after Omer's employment had been terminated, that Alex became aware of the fraud.

36.     Accordingly, through this instance alone, Omer, by fraud and deceit, breached his fiduciary duties to Plaintiffs, and effectively misappropriated $580,000.00 from 260-261 Madison.

37.     As further detailed in this Complaint, however, this instance of deception was only the proverbial "tip of the iceberg" when it came to Omer's egregious improprieties as General Counsel of the Sapir Organization.

**D.    Alex Seeks to End His Partnership with Rotem, and
Omer Begins Misappropriating Proprietary Information**

38.     On September 24, 2014, Tamir passed away, leaving behind a Last Will and Testament.  By Order dated December 18, 2014, the New York County Surrogate's Court issued Preliminary Letters Testamentary to Alex to act as executor of the Estate of Tamir Sapir (the "Estate").

39.     Over the next few years following Tamir's death, the Rosens, who at the time were still viewed as Plaintiffs' faithful advisors, abused their positions of trust to gain inside, private, and non-public information about intra-family disputes and controversies to ultimately leverage as much money for themselves as possible, as detailed below.

40.     By 2017, without contributing even $1 of his own money to ASRR, Rotem had drawn for himself handsome profits of over $42 Million from his partnership interest in ASRR, in addition to his by-then approximately $12,000.00 weekly compensation for services rendered to Sapir Organization entities and generous monthly expense reimbursements.  However, this was not enough; as part of their concerted scheme to obtain total control of the Sapir Organization and convert its assets, the Rosens began systematically attempting to erase the Sapir brand and replace it with Rotem's signature "RR" brand (employed in the "ASRR" moniker) by renaming entities, making sure new entities were "ASRR" entities, and imprinting the "ASRR" brand next to the Sapir Organization brand on everything from marketing materials to the Employee Handbook.

41.     By early 2017, Alex finally had enough and sought to end his partnership with Rotem, and Rotem's involvement with the Sapir Organization.

42.     Accordingly, Rotem shifted his strategy from one of controlling the Sapir Organization to extracting as much money from it as possible as the price for his exit.  To that end, Rosen demanded an exorbitant buyout under extremely onerous terms.  During the course of the week of June 14-21, 2017, Rotem faced off with Alex in numerous and often contentious meetings, during which Omer was present and gave advice and counsel.

43.     In the interest of moving on as expeditiously as possible, and given that Rotem was still married to his sister, Zina, Alex agreed in large part to Rotem's terms for separation, and they executed a "Binding LOI" reflecting the terms of the separation on June 21, 2017 (the "LOI").  Under the LOI, Alex agreed to, among other things, purchase Rotem's interest in various assets and subsidiaries that ASRR had acquired over the years for $70 Million, as well as transfer Alex's interests in other assets beneficially owned by ASRR to Rotem.  In exchange,

Rotem agreed to, *inter alia*, sign a broad mutual general release specifically designed to permanently extricate and disentangle Rotem from Alex and the entire Sapir Organization and prevent him from extracting any more money from the Sapir family.

44.    The LOI did not provide for a complete dissolution of ASRR however, and the entity remained intact with a few small ancillary investments that Rotem refused to include in the buyout.

45.    Meanwhile, Omer was quietly engaging in other wrongful conduct.

46.    During the same week of June 14-21, 2017, while Rotem was negotiating the terms of his buyout with Alex, Omer, sensing he would likely be asked to leave the Sapir Organization as well, began systematically misappropriating from the Sapir Organization's secure server hundreds of highly sensitive, confidential and/or trade secret files belonging to his employer, SFM and various Sapir Organization entities and Sapir family members.  Specifically, between June 14, 2017 and June 21, 2017, without authorization and in breach of his express contractual and common law obligations, Omer sent no fewer than *one thousand, five hundred fifteen* (1,515) documents, almost all constituting Plaintiffs' confidential, proprietary and/or trade secret information, beyond Plaintiffs' firewall, to Omer's personal email account (omer_rosen@yahoo.com), and then deleted the transmission of these documents from his Sapir Organization email sent folder, all in a deliberate effort to cover his tracks.

47.    The misappropriated information includes operating agreements, limited partnership agreements, joint venture agreements, membership purchase agreements, and other organizational documents indicating equity financing terms and structures, including drafts thereof and amendments, purchase and sale agreements, including drafts thereof and amendments, real estate acquisition term sheets, loan documents, including promissory notes,

security agreements, payment guarantees, guarantees of expenses, recourse carve-out guarantees, guarantees of completion, pledge and assignment agreements, including drafts thereof, along with other loan and lender information, loan consultant agreements, development agreements, management services agreements, contractor, architect, construction management, license and access, and other construction contracts, including drafts thereof, aircraft leases and maintenance agreements, including drafts thereof, service agreements and internal notes regarding best practices with respect to same, sales and leasing broker agreements, including drafts thereof, and documents concerning confidential negotiations of commission amounts and structures, such as the Sapir Organization's internal "discussions points" memorandum used for such negotiations, marketing and branding agreements, non-disclosure agreements, highly confidential settlement agreements, leases, key business contact information, vendor agreements (including those involving fees and scopes of services), and summaries of the Sapir Organization's assets and liabilities.  These documents contain technical data, methods and procedures of business operations, and financial data, all of which would cause irreparable harm to the Sapir Organization if disclosed to a competitor or used in connection with activities competitive with Plaintiffs.

48.    The Sapir Organization invested tremendous time, effort, energy, expense and resources to develop, negotiate and create these documents, and the information contained therein, which include its proprietary market research and business and development plans, for its private use to expand its businesses and profitability (the "Proprietary Information").  The Proprietary Information contained in these documents would be damaging in the hands of a competitor and would be used to unfairly compete by aiding a competitor in property acquisition, development and management negotiations, lending and financing negotiations, including terms

and sources of financing, securing equity financing on favorable terms, developing branding and marketing proposals, undercutting transactions with potential deal counterparts or building tenants, gaining inside information as to how buildings and properties are managed and how expenses are recouped, as well as the cost and scope of development and property improvements, and similar items that would allow a competitor to match or undercut terms or duplicate the Sapir Organization's proprietary formulas and methods for in-house development, construction, management and financing.

49.    Omer, upon information and belief, exploited his intimate knowledge of the Sapir Organization, and all its dealings, to specifically cull from terabytes of data on SFM's servers to curate this compilation of proprietary and confidential information.  No one outside of a few trusted employees within the Sapir Organization could have created this compilation of documents, as it would require full knowledge of the Sapir Organization public and private business dealings, as well as intimate knowledge of how the Sapir Organization maintains, stores and organizes information on its servers.  In addition, the vast majority of these documents were obtained from a separate, secure database maintained by the SFM and to which only a few select employees were allowed access.  Omer, by virtue of his position as General Counsel, had access to this database.  At no time was Rotem given access to this database.

50.    The amount of hand-picked information that Omer took is so vast and all-encompassing of the operations and strategies of the Sapir Organization that it would be impossible for anyone to retain by memory.

51.    Such information contained the intricate details and inner-workings of the Sapir Organization, including but not limited to its extensive negotiations, pricing information, and deal and investment structures and strategies.

52.    Taken together, this unique combination of documents compiled by Omer, an individual paid and trusted by Plaintiffs, is highly valuable and unique to the Sapir Organization, provides the Sapir Organization with a competitive advantage, and was specifically created to transfer that competitive advantage and benefit to the Rosens.

53.    Omer's concealment of his misappropriation was initially effective, as his wrongdoing was not discovered until earlier this year, when Plaintiffs conducted a forensic analysis of Omer's work computer issued by the Sapir Organization and discovered that Omer, inevitably in collaboration with Rotem, misappropriated, converted and stole Plaintiffs' Proprietary Information, including documents and electronic data, the vast majority of which contain confidential, proprietary and/or trade secret material concerning nearly every asset owned by the Sapir Organization, as well as sensitive and confidential information regarding various members of the Sapir family.  As a result of Omer's active concealment in deleting the emails transmitting these documents to his personal email account, Plaintiffs could not have been expected to discover Omer's misappropriation any earlier than they did.

54.    Further, upon information and belief, this was only part of Omer's blatant theft of proprietary and/or confidential Sapir Organization trade secrets and documents.  Given that the emails and attachments were deleted, the documents that Omer took could only be recovered by title, and some of the documents sent could not be located or recovered.  Plaintiffs will only be able to ascertain the contents of these misappropriated documents by seeking discovery from Omer.

55.    Omer's attempt to conceal his misappropriation of these documents underscores his bad faith intent in taking the documents.  Moreover, as detailed below, his actions were in

blatant violation of the Sapir Organization's policies, its Employee Handbook, and the Confidentiality and Work for Hire Agreement previously executed by Omer.

56.    The Sapir Organization makes thorough and significant efforts to maintain the confidentiality of these types of documents, including by keeping all of these files on computer networks and email systems that are password-protected, to which only those with a need to review such documents are provided access.

57.    In addition to securing the Sapir Organization's documents and information with password protections and limited access, SFM employees, including Omer, were instructed not to utilize platforms such as Dropbox to share documents or to send any documents beyond the Organization's secure firewall to their personal email accounts.  Omer, in his role as General Counsel, was charged with implementing and enforcing such policies.

58.    Moreover, the Sapir Organization Employee Handbook, which Omer was responsible for implementing and updating in conjunction with HR in his role as General Counsel, expressly details the importance of protecting and safeguarding the Sapir Organization's proprietary, confidential and/or trade secret information.

59.    In addition, beginning in 2016, all SFM employees and new hires were required to execute a Confidentiality and Work-For-Hire Agreement (the "Confidentiality Agreement") as a condition of their employment.  Omer signed his Confidentiality Agreement on March 22, 2016, pursuant to which he agreed to "hold in strictest confidence, and not to use, except for the benefit of" his employer, any Confidential Information, which is defined to include, among other things, trade secrets or know-how, markets, developments, business plans and other business information.  The Confidentiality Agreement further obligated Omer to return to the Sapir

Organization all documents and property, including the above-referenced Confidential Information, at the time that Omer ceased performing services for the Sapir Organization.

60.     Following Alex's buyout of Rotem's interest in any Sapir Organization entities, the Organization implemented additional security procedures designed to protect its confidential and proprietary information from third parties, including Rotem Rosen in particular. As such, after the buyout, all employees, including Omer, were required to read, acknowledge and adhere to a click-through acknowledgment each time they sought to gain access to the Sapir Organization's computer system.

61.     Thus, each and every time Omer initiated a fresh access to the proprietary Sapir Organization computer system, Omer expressly consented to and agreed that the information stored on the computer system is the property of the Sapir Organization, and is designed to protect against unauthorized duplication of documents and to protect and maintain the confidentiality and integrity of information obtained by access to Sapir Organization computing technology:



62.     Finally, simultaneously with the closing of the buyout transaction, all SFM employees were required to sign an additional confidentiality agreement as a condition of their continued employment (the "2018 CA," and together with the Confidentiality Agreement, the "Confidentiality Agreements").  Section 2 of the 2018 CA expressly prohibits the sharing of any confidential information with third parties, including Rotem Rosen specifically.  Omer executed the 2018 CA on or about March 8, 2018.

63.     Despite having disregarded the terms of his Confidentiality Agreements and his employer's policies and prohibitions, and having stolen all of the documents he considered useful to him and Rotem at the time, Omer approached Alex at the conclusion of Alex's buyout negotiations with Rotem and pleaded with Alex to keep him on as General Counsel to the Sapir

Organization, notwithstanding his brother's acrimonious exit.  Omer assured Alex that he could

be trusted, that he would be loyal to his employer, and that he would act in the best interest of the

Sapir Organization at all times.  Unaware of Omer's misdeeds or his true intentions, Alex agreed

to let Omer stay on as General Counsel.

**E.    The Buyout Transaction Finally Closes, Yet Rotem Continues to Leverage all Remaining Entanglements, While Omer Assists From the Inside**

64.    Following the execution of the LOI in June 2017, Rotem ceased performing any

actions as an officer, director, member or manager of any of the entities in which Alex had

agreed to purchase his interest pursuant to the LOI.  However, in an amendment to the LOI

executed in July 2017, the parties agreed, as per Rotem's request (predicated on tax

considerations), that the transactions not close until 2018.  After numerous delays, on March 8,

2018, Alex and Rotem finally closed on the transactions contemplated by the LOI, as amended,

and executed the Mutual Release.  Under the Mutual Release, both Rotem and ASRR agreed

that:

> . . . each Party hereunder, on behalf of itself/himself and, to the extent applicable and to the fullest extent permitted by law, on behalf of its/his members, principals and beneficial owners (whether direct or indirect), managers, officers employees, representatives, agents, predecessors, successors, assigns, parents, divisions, and affiliates (the "Affiliated Parties") hereby releases and discharges all other Parties and Affiliated Parties from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands, whatsoever, in law, equity or otherwise, whether known or unknown, whether foreseen or unforeseen (regardless of by whom raised), whether asserted or unasserted, whether contingent or vested, whether choate or inchoate, whether in contract, tort or otherwise, whether past, present or future, whether liquidated or unliquidated, whether fixed or unfixed, ***whether direct or derivative***, whether matured or unmatured, whether suspected or unsuspected, and/or whether or not concealed, sealed, or hidden

which each Party and/or Affiliated Parties ever had, now has or hereafter can, shall or may have (collectively, the "Claims"), arising out of or relating to the Assets and/or the Parties' interests therein and/or *to any Claims relating to Rosen's affiliation with any entity controlled or managed (in whole or in part) by or affiliated with Sapir*, ASRR Capital Ltd. and/or the Companies or any of the respective affiliates of each of the foregoing entities *from the beginning of the world to the day of the date of this Mutual Release.*

65.    Section 3 of the Mutual Release provides that:

Each Party acknowledges and agrees that in the event of a dispute regarding this Mutual Release, *a Court should interpret the releases contained herein as broadly as possible*[.]

66.    The Mutual Release also specifically releases all claims that "a Party and/or Affiliated Parties hereafter may discover, incur or suffer" that were "unknown or unanticipated at the time the Party signed this Mutual Release."

67.    Section 6 of the Mutual Release further provides that:

Each Party covenants not to sue any other Party or Affiliated Parties with respect to the Claims and Potential Claims. Each Party further agrees that this provision may be specifically enforced, and agrees that in the event any Party breaches such covenant, *the breaching Party shall pay the non-breaching Parties' reasonable attorneys' fees and costs*.

68.    The Mutual Release was executed by Rotem, ASRR, Alex, and 260-261 Madison Avenue Junior Mezzanine LLC, the ultimate parent of 260-261 Madison.

69.    Following the closing, Rotem began executing several real estate transactions involving competing assets through MRR Development, LLC ("MRR"), a partnership he formed sometime in 2017 and formalized in October 2017 with Anand Mohindra, an Indian billionaire. Upon information and belief, Rotem used the Proprietary Information misappropriated from the Sapir Organization in connection with the acquisition, operation and/or development of these

assets.  Indeed, the massive library of documents that Omer misappropriated provides a roadmap to establish a business to directly compete with the Sapir Organization.

70.    For example, on June 16, 2017, Omer sent from his Sapir Organization email account to his private email account no fewer than 69 proprietary and confidential documents concerning the Sapir Organization's acquisition and planned development of a residential, retail and commercial project at the real property located at 210 NE 18th Street, Miami, Florida, in Miami's burgeoning Arts & Entertainment District, including the Purchase and Sale Agreement, its amendments and schedules, and various drafts of these agreements and comparisons showing the changes among drafts, corporate formation and governance documents, including operating agreements, joint venture agreements, limited partnership agreements, buy-sell agreements, and membership interest purchase and sale agreements, all of which evidenced the equity financing structures employed for the purchase and planned development of the property, investment documents, and mezzanine-level debt agreements.  These documents, taken together, detail the confidential, extensive negotiations among the Sapir Organization and its lenders, outside investors and the seller, and reveal the complex ownership, investment and financing structure that allows for profitability and the liquidity necessary to develop, manage and carry the property.

71.    In June 2018, MRR acquired an option to purchase a development site in Miami located across the street from the Sapir Organization's development site located at 210 NE 18th Street.  Upon information and belief, Rotem improperly utilized the Sapir Organization's Proprietary Information to evaluate the development site, potential deal and financing terms, construction and development methods, and equity investment structures and financing to negotiate the acquisition and financing of this sibling property.

72.    By way of further example, among the documents Omer sent from his Sapir Organization email account to his private email account were mortgage and mezzanine loan documents and amendments thereto, loan guaranties and other documents relating to the financing of the NoMo SoHo Hotel in Manhattan, New York, including numerous redlines reflecting the negotiations regarding the terms of such financing, the term sheet and purchase agreement for the acquisition of the hotel, and confidential settlement documents resolving legal disputes with Morgans Hotel Group, the former operator of the hotel.

73.    Upon information and belief, Rotem once again improperly used confidential Sapir Organization information to his benefit and the benefit of his new partners by purchasing, in November 2018, through MRR, the Hotel Indigo, which is approximately 10 minutes away from, and directly competes with, the NoMo SoHo Hotel owned by a Sapir Organization entity.

74.    Omer also misappropriated dozens of documents related to a joint venture the Sapir Organization had been negotiating with a large third-party real estate developer at the time. Tellingly, in March 2019, while on "vacation" out of the country, Omer requested that his assistant at the Sapir Organization send him an operating agreement draft and correspondence containing negotiations with this same developer, notwithstanding the fact that the proposed joint venture transaction had been canceled almost 2 years prior.  Omer's assistant complied with his instructions, and then deleted the email from her sent items folder.  One month later, Rotem, through MRR, closed a joint venture with this same developer.

75.    Upon information and belief, the Rosens' misappropriation of the Proprietary Information usurped the Sapir Organization's competitive advantage and transferred such advantage to the Rosens and MRR to enable them to unfairly compete with the Sapir Organization.

76.     During this same period, without knowledge of the Rosens' misappropriation, Alex continued to try to extricate himself from any further dealings with Rotem and repeatedly requested that ASRR be dissolved.  Finally, in December 2018, Rotem agreed to liquidate and distribute amongst the partners all remaining ASRR assets, for a price.  However, there remained one liability held by ASRR that prevented its dissolution.  The liability was in the form of certain loans structured to pay the premiums on the life insurance policies Alex and Rotem had purchased years before.  Alex was obligated under the LOI, as amended, to continue to pay Rotem's life insurance premiums to the extent required by the policy, so he offered to refinance the loans using one of his entities as the borrower.  Rotem agreed, as stated in the Binding Term Sheet that Rotem/Omer drafted in December 2018 to reflect the terms of this "final unwinding" between Alex and Rotem, that "[p]rior to closing and, if necessary thereafter, AS and RR agree to discuss in good faith commercially reasonable terms for the dissolution of ASRR LLC (DE) and ASRR LLC (NY) and those actions and terms necessary to effectuate a $17.5 insurance loan related to RR and AS's respective life insurance trusts."

77.     Notwithstanding the foregoing agreement, Rotem subsequently flatly refused to consent to any refinancing of the insurance loan or have any further discussion of same, thereby preventing the dissolution of ASRR, and the transaction contemplated under the Binding Term Sheet closed one month later, in January 2019, without Alex having received the bargained for good faith negotiation regarding dissolution of ASRR.  Rotem's reason for breaching his agreement to negotiate with Alex in good faith, as well as the fact that he never had any intention of keeping this promise when he made it, became abundantly clear a mere month later, when Omer, the General Counsel, suddenly left the country for over a month without notifying his

boss, Alex, while Alex was served with the Frivolous Claim described below. Needless to say, upon Omer's return weeks later, his employment was terminated by SFM.

78.    Upon Omer's termination, he failed to return the secretly stolen Proprietary Information in his possession, in further violation of the Confidentiality Agreements.

**F.    After Alex and Rotem Separate, Zina Seeks a Divorce and Rotem Retaliates by Violating the Operating Agreement and Mutual Release to Harass the Sapir Family with Frivolous Legal Claims**

79.    Following Alex's decision to end his relationship with Rotem, Rotem's relationship with Alex's sister Zina continued to deteriorate and it was not long before Zina determined to file for divorce from Rotem. Once Rotem became aware of Zina's plans to divorce him, he immediately began executing his pre-planned strategy to gain as much leverage as possible against the Sapirs and maximize the cost for Zina's decision to divorce him.

80.    To that end, nearly five years after Tamir had died, Rotem concocted a claim based on alleged oral promises by Alex to support the filing of an entirely frivolous $102,900,000 claim against Tamir's Estate, and brought it *on behalf of ASRR*, without Alex's knowledge or consent, as a purported derivative claim (the "Frivolous Claim"). In addition to being wholly without merit, the Frivolous Claim is expressly barred by the Mutual Release that Rotem signed in exchange for approximately $75 Million, because it plainly relates to ASRR and is based upon transactions that undisputedly concluded in 2015, three years prior to the Mutual Release.

81.    By filing the Frivolous Claim, Rotem also violated the Operating Agreement pursuant to which Rosen agreed to waive any right to act alone on behalf of ASRR by virtue of being a member, and to not take any action as manager that has an effect of over $50,000.

82.    Further underscoring the frivolity of Rotem's newly-minted claim is that at no time during the years following Tamir's death did either of the Rosens ever mention any claim by Rotem or ASRR against the Estate, despite Rotem and Omer's constant and continuous participation in countless meetings, conference calls and other communications regarding the administration of the Estate.

83.    Equally telling of Rotem's bad faith intent is that it was not until Zina began meeting with attorneys and preparing to file for divorce from Rotem that Rotem filed the Frivolous Claim against the Estate - even though the Estate had been winding up since 2014 and the transactions allegedly giving rise to Rotem's Claim were completed years earlier in 2015. Moreover, Rotem filed the Frivolous Claim on behalf of the ASRR entity merely one month after the closing of the final unwinding transaction between him and Alex, clearly evidencing that he never had any intention to honor his promise to negotiate in good faith for a dissolution of ASRR, but instead intended to keep the entity alive so that he could use it for his nefarious purposes.

84.    On or about May 17, 2019, the Estate filed a Petition in Surrogate's Court, for an order, *inter alia*, disallowing the Frivolous Claim (the "Petition").

85.    To add insult to injury, the true purpose of the Frivolous Claim ultimately became clear when Rotem filed his Answer to the Petition.  The Frivolous Claim afforded Rotem the appearance of standing, which he then used to file entirely baseless counterclaims against Alex seeking an accounting of the Estate and the removal of Alex as the Preliminary Executor.  Rotem then used these counterclaims as a platform to publicly smear the Sapir Organization and the Sapir family.

86. Indeed, Rotem's counterclaims are rife with allegations that the Sapir Organization suffered financial setbacks due to mismanagement rather than the recession, and contain references to old, long-resolved Sapir family controversies designed to stir up animosity among the Estate's beneficiaries and damage their good names and reputations. The counterclaims rely, in large part, on corruptions of the information that the Rosens gained in their capacities as formerly-trusted advisors, officers and attorneys of the Sapir Organization.

87. Moreover, apparently not content with simply using the documents they had misappropriated to usurp Plaintiffs' commercial advantage to gain an unfair competitive edge, the Rosens also used some of the misappropriated documents as a means of harassing and/or extracting additional sums from the Sapir family via the Frivolous Claim. Among the documents Omer sent from his Sapir Organization email account to his private email account were confidential documents concerning a long-resolved dispute between Alex and his aunt, Rozita Sapir, regarding his father's Estate, which Rotem placed out of context to support his spurious counterclaims against Alex, as Preliminary Executor of his father's Estate.

88. The Estate has moved for summary judgment to dismiss the Frivolous Claim, which is presently pending.

89. However, the damage caused by Rotem to the Sapir Organization and family from his breaches of the Mutual Release, the Operating Agreement and the Binding Term Sheet in filing the Frivolous Claim has already been done. Those damages include, but are not limited to, the significant attorneys' fees incurred in defending the Frivolous Claim, which are expressly recoverable under the Mutual Release.

90.     As a direct result of all of the Rosens' aforementioned breaches of contracts, fraud, deceit and misappropriation of Proprietary Information, Plaintiffs have been irreparably damaged in an amount to be determined at trial.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract against Rotem)

91.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

92.     As set forth above, on March 8, 2018, Alex and Rotem executed the Mutual Release.

93.     The Mutual Release is a valid and enforceable contract.

94.     Alex has and continues to faithfully perform his obligations under the Mutual Release.

95.     Rotem breached the Mutual Release by the conduct more fully described above.

96.     As a result of Rotem's breach, Alex was damaged in an amount in excess of $75,000,000.00, plus attorneys' fees, costs and expenses.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract against Rotem)

97.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

98.     As set forth above, on June 7, 2011, Alex and Rotem executed the Operating Agreement.

99.     The Operating Agreement is a valid and enforceable contract.

100.    Alex faithfully performed his obligations under the Operating Agreement.

101.    Rotem breached the Operating Agreement by the conduct more fully described above.

102.    As a result of Rotem's breach, Alex was damaged in an amount of at least $5,000,000.00, plus attorneys' fees, costs and expenses.

103.    In addition, Alex is entitled to an order permanently restraining Rotem from taking any action, including, but not limited to, the filing of any purported derivative claims on behalf of ASRR, without the express written consent of Alex, and/or his heirs, successors and assigns.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (Breach of Contract against Rotem)

104.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

105.    As set forth above, Alex and Rotem entered into the Binding Term Sheet.

106.    The Binding Term Sheet is a valid and enforceable contract.

107.    Alex faithfully performed his obligations under the Binding Term Sheet.

108.    Rotem breached the Binding Term Sheet by the conduct more fully described above.

109.    Rotem's breaches of the Binding Term Sheet have caused irreparable harm for which no adequate remedy at law exists.

110.    Accordingly, Alex is entitled to specific performance of the Binding Term Sheet or, in the alternative, damages incurred as a result of Rotem's breach thereof, in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing against Rotem)

111.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

112.    Implied in every contract is a covenant of good faith and fair dealing, which imposed upon Rotem a duty of good faith and fair dealing and which required that Rotem not do anything to deprive Alex of the benefit of their contracts, including the Binding Term Sheet.

113.    Rotem breached the covenant of good faith and fair dealing by virtue of the conduct detailed more fully above.

114.    By Rotem's failure to dutifully perform his obligations to Alex as set forth more fully above, Rotem has deprived Alex of the benefit of and consideration for which Alex bargained.

115.    Rotem's continuing breaches of his duty of good faith and fair dealing arising out of his contracts with Alex have proximately caused and continue to proximately cause damage to Alex, in an amount to be proven at the trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty against Omer)

116.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

117.    As General Counsel to the Sapir Organization, and specifically, Plaintiffs 260-261 Madison and SFM, Omer owed fiduciary duties of care, good faith, and loyalty to Plaintiffs.

118.    More specifically, Omer owed a duty of undivided and unqualified loyalty to Plaintiffs, which encompassed good faith efforts on the part of Omer to ensure that he did not personally profit at the expense of Plaintiffs through bad faith transactions, self-dealing, or willful misconduct.  Further, Omer owed a duty to give advice for the benefit of Plaintiffs upon

all matters within the scope of the parties' relationship, and was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties in all matters for which he was employed.

119.    Omer breached his fiduciary duties by engaging in acts of self-dealing by way of the conduct set forth above.

120.    As set forth above, Plaintiffs suffered and continue to suffer damages as a direct result of Omer's breach of fiduciary duties.

121.    Accordingly, Plaintiffs are entitled to a money judgment against Omer in an amount to be determined at trial, including compensatory, consequential, and punitive damages, including disgorgement of all compensation paid to Omer during his period of disloyalty and any and all profits made by Omer as a result of his disloyalty and self-dealing.  Plaintiffs also are entitled to recover their attorneys' fees and costs.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Fraudulent Inducement against Omer)**

122.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

123.    As set forth above, Omer made material misrepresentations and omissions to Plaintiffs to induce 260-261 Madison to enter into the Loan.

124.    As set forth above, Plaintiffs justifiably relied on Omer's misrepresentations and omissions in signing the Note and issuing the Loan.

125.    As set forth above, Plaintiffs suffered damages as a result of Omer's fraudulent conduct and material omissions regarding the Loan and Note as alleged herein.

126.    Accordingly, Plaintiffs are entitled to a money judgment against Omer in an amount to be determined at trial, including compensatory, consequential and punitive damages.

127.    Moreover, based on Omer's fraud and self-dealing in connection with the Loan as set forth fully above, Plaintiffs are entitled to rescission of the Loan in its entirety.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation against Omer)

128.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

129.    As set forth above, a special relationship existed between Omer, as General Counsel, and Plaintiffs.

130.    As set forth above, based on the existence of said relationship, Omer owed a duty to impart correct information to Plaintiffs, upon all matters within the scope of the parties' relationship.

131.    Omer breached that duty and imparted incorrect information and omitted numerous material facts from Plaintiffs due to his blatant conflicts of interest.

132.    As set forth above, Plaintiffs suffered damages as a result of Omer's fraudulent conduct and material omissions, both in representing Plaintiffs in connection with the Loan and in all other transactions that involved his brother Rotem in any way, shape or form.

133.    Accordingly, Plaintiffs are entitled to a money judgment against Omer in an amount to be determined at trial, including compensatory, consequential and punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Breach of Contract against Omer)

134.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

135.    As set forth above, on March 22, 2016, and again on March 8, 2018, SFM and Omer executed the Confidentiality Agreements.

136.   The Confidentiality Agreements are valid and enforceable contracts.

137.   SFM fully and faithfully performed its obligations under the Confidentiality Agreements.

138.   Omer breached the Confidentiality Agreements by the conduct more fully described above.

139.   As a result of Omer's breaches, SFM was damaged in an amount to be determined at trial, plus attorneys' fees, costs and expenses.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing against Omer)

140.   Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

141.   Implied in every contract is a covenant of good faith and fair dealing, which imposed upon Omer a duty of good faith and fair dealing and which required that Omer not do anything to deprive SFM of the benefit of their contracts.

142.   Omer breached the covenant of good faith and fair dealing by virtue of the conduct detailed more fully above.

143.   By Omer's failure to dutifully perform his obligations to SFM as set forth more fully above, Omer has deprived SFM of the benefit of and consideration for which SFM bargained.

144.   Omer's continuing breaches of his duty of good faith and fair dealing arising out of his contracts with SFM have proximately caused and continue to proximately cause damage to SFM, in an amount to be proven at the trial.

**AS AND FOR A TENTH CAUSE OF ACTION**
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*,**
**against Omer and Rotem)**

145.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

146.    As set forth above, Plaintiffs are the owners of valuable trade secrets related to products and/or services used in, or intended for use in, interstate or foreign commerce.

147.    As set forth above, such trade secrets comprise Plaintiffs' financial, business, technical and economic information, and consist of, among other things, Plaintiffs' documents and electronic data containing proprietary, confidential and trade secret material concerning nearly every asset owned by the Sapir Organization.

148.    As set forth above, at all relevant times, Plaintiffs have taken reasonable measures to keep such information secret, including, among other things, by limiting disclosure of such information to those needing it to perform their businesses duties, limiting disclosure of information to those under confidentiality obligations, and/or requiring persons privy to such information to be bound by written confidentiality agreements, such as the confidentiality provisions included within the Confidentiality Agreements executed by Omer.

149.    As set forth above, Plaintiffs' trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

150.    As set forth above, Omer misappropriated Plaintiffs' trade secrets by acquiring them through improper means in violation of common law and the federal Defend Trade Secrets

Act, and thereafter using them to help his brother Rotem unfairly compete with the Sapir Organization.

151.    As set forth above, Rotem misappropriated Plaintiffs' trade secrets by using them with Omer after the date of the Mutual Release, when he knew they were acquired through improper means, in violation of common law and the federal Defend Trade Secrets Act.

152.    Omer and Rotem's conduct was willful and malicious, entitling Plaintiffs to an award of exemplary damages and attorneys' fees under 18 U.S.C. §§ 1836(b)(3)(C) and (D).

153.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Unfair Competition against Omer and Rotem)

154.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

155.    As set forth above, Omer willfully and maliciously misappropriated a commercial advantage belonging to Plaintiffs, namely, trade secrets and/or proprietary and confidential information, as described more fully above.

156.    As set forth above, Omer and Rotem acted in bad faith in misappropriating Plaintiffs' commercial advantage in that their only purpose in doing so was to unfairly compete with the Sapir Organization.

157.    As a result of Omer and Rotem's willful and malicious unfair competition and misappropriation of Plaintiffs' trade secrets and proprietary information, Plaintiffs were damaged in an amount to be determined at trial, plus attorneys' fees, costs and expenses.

**WHEREFORE**, Plaintiffs hereby request that the Court grant the following relief:

(i)     An award of damages, including, but not limited to, compensatory, consequential, punitive and exemplary damages, and lost profits, in an amount to be determined at trial of no less than $100,000,000.00;

(ii)    An order permanently restraining Rotem from taking any action, including, but not limited to, the filing of any purported derivative claims, on behalf of ASRR, without the express written consent of Alex, and/or his heirs, successors and assigns;

(iii)   An order for specific performance of the Binding Term Sheet;

(iv)    An order requiring the return or permanent destruction of all Proprietary Information and permanently restraining all Defendants from using any of the Proprietary Information for any purpose;

(v)     Rescission of the Loan;

(vi)    An award of Plaintiffs' costs, disbursements and attorneys' fees incurred in prosecuting this action to the fullest extent permitted by law;

(vii)   An award of pre- and post-judgment interest; and

(viii)  Any and all other and further relief as the Court may deem just and proper.

Dated: New York, New York
       September 29, 2020

                                        By:     /s/ Andrew J. Urgenson
                                                Terrence A. Oved, Esq.
                                                Darren Oved, Esq.
                                                Andrew J. Urgenson, Esq.
                                                Glen Lenihan Esq.
                                                OVED & OVED LLP
                                                *Attorneys for Plaintiffs*
                                                401 Greenwich Street
                                                New York, New York 10013
                                                Tel:  212.226.2376