UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC-SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC#:                            │
│ DATE FILED:  09/30/2021          │
└─────────────────────────────────┘
```

---

ALEX SAPIR, 260-261 MADISON
AVENUE LLC, and SFM REALTY
CORP.,

                          Plaintiffs,

              v.

ROTEM ROSEN, OMER ROSEN, and
JOHN and JANE DOE 1-100,

                          Defendants.

---

No. 20-cv-6191 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs Alex Sapir, 260-61 Madison Avenue LLC, and SFM Realty Corporation (collectively, "Plaintiffs"), bring this action against Rotem Rosen—Alex Sapir's former business partner and former brother-in-law—and Rotem's brother Omer Rosen (collectively, "Defendants").[1]  Alex Sapir is the President and CEO of the Sapir Organization, a real estate company of which the two other Plaintiffs are subsidiary entities and which previously employed both Defendants.  Plaintiffs allege that the Rosen brothers breached various contractual obligations owed to them, committed fraud against them, and misappropriated their trade secrets, all in a wide-ranging campaign to extract money from the Sapir Organization and usurp its competitive advantage in the real estate industry.  Defendants have each moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  For the reasons that follow, the Court concludes that Plaintiffs have failed to adequately allege that

---

[1] Plaintiffs have also named John and Jane Does 1-100; however, their Complaint does not mention any actions by unknown individuals.

Defendants misappropriated trade secrets in violation of the Defend Trade Secrets Act ("DTSA").  Because Plaintiffs' DTSA claim was their sole federal cause of action, the Court dismisses this case for lack of subject matter jurisdiction.[2]  Plaintiffs may, however, amend their Complaint to replead their federal claim; if they do so, they may also replead their state law claims.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Plaintiffs' Amended Complaint, Dkt. 25 ("Compl."), and are assumed to be true for the purposes of resolving this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 33 (2d Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### A.    The Rosens' Entry into the Sapir Family and Organization

Alex Sapir ("Alex") is the President and CEO of the Sapir Organization, which owns, operates, and develops real estate.  Compl. ¶¶ 1, 13.  The Sapir Organization was founded by Alex's father, Tamir Sapir.  *Id.* ¶ 1.  It consists of "a group of privately-held companies," including 260-61 Madison Avenue LLC ("260 Madison"), "that are owned and operated by members of the Sapir family."  *Id.* ¶¶ 7-8.  SFM Realty Corporation ("SFM") maintains the Sapir Organization's corporate offices and employs its corporate-level staff.  *Id.* ¶ 9.

In 2007, Alex's sister Zina married Rotem Rosen ("Rotem").  *Id.* ¶ 17.  Two years later, Rotem approached Alex "seeking to revive his failing career in the real estate industry" and asked for a role in the Sapir Organization.  *Id.* ¶ 19.  Rotem then began performing real estate

---

[2] Although Defendants requested oral argument, upon review of the parties' submissions, the Court has determined that argument was not necessary to decide the instant motions.  *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005); *Kpaka v. City Univ. of New York*, No. 14-CV-6021 (RA), 2015 WL 4557331, at *1 n.2 (S.D.N.Y. July 28, 2015) (observing that a party in a civil action "is not entitled to a hearing as a matter of right").

advisory services for the Organization.  *Id.*  Plaintiffs allege that Rotem gradually "entrench[ed]" himself even deeper in Plaintiffs' business" after this, asserting opinions about how the business should be run and how Tamir should manage his wealth and liabilities.  *Id.* ¶ 20.  According to Plaintiffs, Rotem continued to "extend the reach of his control by implanting pliable allies and loyal associates at all levels of the Sapir Organization," including his brother, Omer Rosen ("Omer"), who became the Sapir Organization's General Counsel.  *Id.* ¶ 24.  In 2011, Rotem and Alex further formalized their business relationship through the formation of ASRR, an LLC in which they were each 50% owners and managing members.  *Id.* ¶¶ 20-21.  Plaintiffs allege that Rotem used his position as Alex's partner to "assert increasing control over all the Sapir Organization's entities," and that Omer, "as trusted legal counsel, continually assured Alex that Rotem was acting appropriately and that his proposals were in the best interest of the Sapir Organization."  *Id.* ¶ 25.

The Rosen brothers' "concerted scheme to obtain total control" included replacing the Sapir Organization brand with Rotem's signature brand "ASRR"; making sure new entities of the Organization were "ASRR" entities; and imprinting the "ASRR" brand "on everything from marketing materials to the Employee Handbook."  *Id.* ¶ 40.  Rotem also enjoyed substantial financial gains through his interest in ASRR, receiving over $42 million in profits without having contributed any of his own money; he received a further $12,000 in weekly compensation for "services rendered to [the] Sapir Organization."  *Id.*  "By early 2017, Alex finally had enough" and decided to end Rotem's involvement with the Sapir Organization.  *Id.* ¶ 41. Accordingly, Alex and Rotem agreed to a buyout, the terms of which were negotiated during the week of June 14, 2017 (and during which Omer gave advice and counsel).  *Id.* ¶ 42.

### B.    The Rosens' Alleged Misappropriation of "Confidential, Proprietary and/or Trade Secret Information"

Despite Rotem's separation from the Sapir Organization and from ASRR, Omer stayed

on as General Counsel, assuring Alex that he could be trusted and would act in the best interest

of the Organization.  *Id.* ¶ 63.  While an employee of SFM—the entity that employed the

Organization's high-level employees—Omer signed two Confidentiality Agreements.  The first,

which he signed in 2016, required employees to "hold [confidential information] in strictest

confidence, and not to use [it], except for the benefit of the Company"—defined in the

Agreement as "the Sapir Organization, ASRR LLC, SFM Realty Corp., and any entity owned or

controlled (whether directly or indirectly) by members of the Sapir family (including, without

limitation, Rotem Rosen), and each of their respective subsidiaries and affiliates."  *Id.* ¶ 59; Dkt.

36-11 at 1.  The second, which he signed in 2018 and which was drafted near the end of Rotem's

buyout, "expressly prohibits the sharing of any confidential information with third parties,

including Rotem Rosen specifically."  Compl. ¶ 62.  SFM also possessed a secure, password-

protected database of documents, to which only "a few select" employees with a "need to review

[such] documents" were given access—indeed, Rotem himself did not have access to this

database while at the Sapir Organization.  *Id.* ¶¶ 49, 56.

According to Plaintiffs, Omer breached both Agreements.  First, during the June 2017

separation negotiations between Alex and Rotem, Omer allegedly sent over a thousand

documents from SFM's secure database to his personal email account and then deleted the

records of those transmissions from the sent folder of his work email.  *Id.* ¶¶ 46, 49.  The

information Omer allegedly misappropriated included:

> operating agreements, limited partnership agreements, joint venture agreements,
> membership purchase agreements, and other organizational documents indicating
> equity financing terms and structures, including drafts thereof and amendments,

4

purchase and sale agreements, including drafts thereof and amendments, real estate acquisition term sheets, loan documents, including promissory notes, security agreements, payment guarantees, guarantees of expenses, recourse carve-out guarantees, guarantees of completion, pledge and assignment agreements, including drafts thereof, along with other loan and lender information, loan consultant agreements, development agreements, management services agreements, contractor, architect, construction management, license and access, and other construction contracts, including drafts thereof, aircraft leases and maintenance agreements, including drafts thereof, service agreements and internal notes regarding best practices with respect to same, sales and leasing broker agreements, including drafts thereof, and documents concerning confidential negotiations of commission amounts and structures, such as the Sapir Organization's internal "discussions points" memorandum used for such negotiations, marketing and branding agreements, non-disclosure agreements, highly confidential settlement agreements, leases, key business contact information, vendor agreements (including those involving fees and scopes of services), and summaries of the Sapir Organization's assets and liabilities.

*Id.* ¶ 47.  These documents "almost all constitute[e] Plaintiffs' confidential, proprietary and/or trade secret information."  *Id.* ¶ 46.  Moreover, Plaintiffs assert that all these documents "would cause irreparable harm to the Sapir Organization if disclosed to a competitor or used in connection with activities competitive with" them.  *Id.* ¶ 47.

Second, while out of the country in March 2019, Omer asked his assistant to email him "an operating agreement draft and correspondence containing negotiations with [a] developer, notwithstanding the fact that the proposed joint venture transaction [with that developer] had been canceled almost 2 years prior."  *Id.* ¶ 74.  His assistant did so, then also deleted this email from her sent items folder.  *Id.*  Plaintiffs learned of these email transmissions only in early 2020, when they conducted a forensic examination of Omer's work computer.  *Id.* ¶ 53.  Because the emails and attachments had been deleted, "some of the documents [Omer] sent could not be located or recovered"; Plaintiffs assert they will be able to ascertain the contents of all the misappropriated documents solely through discovery.  *Id.* ¶ 54.

Plaintiffs further allege that Rotem used the information Omer had appropriated in connection with real estate deals he completed while working at his new company. *Id.* ¶ 69. Specifically, Plaintiffs draw connections between three groups of documents and three of Rotem's transactions:

- Among the documents Omer emailed himself were "documents concerning the Sapir Organization's acquisition and planned development of a residential, retail and commercial project" in Miami. *Id.* ¶ 70. One year later, Rotem's new company "acquired an option to purchase a development site in Miami located across the street from the Sapir Organization's development site." *Id.* ¶ 71.

- Among the documents Omer emailed himself were "mortgage and mezzanine loan documents and amendments thereto, loan guaranties and other documents relating to the financing of the NoMo SoHo Hotel in Manhattan." *Id.* ¶ 72. Over a year later, Rotem's new company purchased "the Hotel Indigo, which is approximately 10 minutes away from, and directly competes with, the NoMo SoHo Hotel." *Id.* ¶ 73.

- The documents that Omer requested his assistant send to him in 2019 consisted of an "operating agreement draft and correspondence containing negotiations with [a] developer." One month later, Rotem "closed a joint venture with this same developer." *Id.* ¶ 75.

Finally, Plaintiffs assert that Rotem used the misappropriated documents "as a means of harassing and/or extracting additional sums from the Sapir family" while pursuing a frivolous claim against the estate of Alex's father, Tamir. *Id.* ¶ 87.

## II.    Procedural Background

On July 17, 2020, Plaintiffs commenced this action in New York Supreme Court. On August 6, 2020, Defendants removed the action to this Court on federal question and supplemental jurisdiction grounds. Dkt. 1. Plaintiffs filed the First Amended Complaint—the operative complaint—on September 29, 2020. Dkt. 25. On October 13, 2020, Defendants filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkts. 29, 34. Plaintiffs filed their opposition on November 17, 2020, Dkt. 42, and Defendants filed their replies on December 1, 2020, Dkts. 46, 48. The parties also subsequently filed supplemental

submissions regarding the Sapir Organization's status as an independent legal entity.  Dkts. 51, 53.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*; claims that are merely "conceivable" or "consistent with" liability are insufficient, *Twombly*, 550 U.S. at 545, 570.  In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).  The Court need not, however, credit "threadbare recitals of the elements of the cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.[3]

## DISCUSSION

Plaintiffs bring eleven claims in this action.  But only one of these claims arises under federal law—the claim that Defendants misappropriated trade secrets in violation of the DTSA—and it is thus the only source of jurisdiction under 28 U.S.C. § 1331.  For the reasons stated below, the Court concludes that Plaintiffs fail to state a claim under the DTSA.  Without the anchor of a federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, and therefore dismisses this case, without prejudice, in its entirety.

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

I.      **Plaintiffs' DTSA Claim Is Dismissed for Failure to Adequately Allege the Existence of Trade Secrets**

Plaintiffs claim that at least some of the information Omer acquired from the SFM database constitutes trade secrets, and that Rotem and Omer misappropriated those secrets in violation of the DTSA.  Setting the question of misappropriation aside, the Court concludes that Plaintiffs fail to adequately plead the existence of protected trade secrets.

The DTSA authorizes the owner of a trade secret that is misappropriated to bring a civil action against the individual who misappropriated the secret.  18 U.S.C. § 1836(b).  The statute defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" which the owner has taken reasonable measures to keep secret and which "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  The Second Circuit has similarly defined trade secrets, for purposes of New York law, as "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).  In determining whether information constitutes a trade secret, New York courts also consider "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the

8

ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* "District courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (collecting cases). Accordingly, the Court looks to New York trade secret law as instructive in deciding whether the documents described in Plaintiffs' Complaint are plausibly alleged to be trade secrets under the DTSA.

"Although the Second Circuit has not articulated a specificity requirement, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *ExpertConnect, L.L.C. v. Fowler*, No. 18 Civ. 4828 (LGS), 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019). In other words, "the law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Sit-Up Ltd. v. IAC/ InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008). "Alleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue, does not give rise to a plausible allegation of a trade secret's existence." *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018). That said, a plaintiff need not disclose "the precise trade secrets misappropriated" to survive a motion to dismiss. *Medtech Prods, Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008).

The Complaint provides a laundry list of documents that might be trade secrets:

operating agreements, limited partnership agreements, joint venture agreements, membership purchase agreements, and other organizational documents indicating equity financing terms and structures, including drafts thereof and amendments, purchase and sale agreements, including drafts thereof and amendments, real estate acquisition term sheets, loan documents, including promissory notes, security agreements, payment guarantees, guarantees of expenses, recourse carve-

9

out guarantees, guarantees of completion, pledge and assignment agreements, including drafts thereof, along with other loan and lender information, loan consultant agreements, development agreements, management services agreements, contractor, architect, construction management, license and access, and other construction contracts, including drafts thereof, aircraft leases and maintenance agreements, including drafts thereof, service agreements and internal notes regarding best practices with respect to same, sales and leasing broker agreements, including drafts thereof, and documents concerning confidential negotiations of commission amounts and structures, such as the Sapir Organization's internal "discussions points" memorandum used for such negotiations, marketing and branding agreements, non-disclosure agreements, highly confidential settlement agreements, leases, key business contact information, vendor agreements (including those involving fees and scopes of services), and summaries of the Sapir Organization's assets and liabilities.

Compl. ¶ 47.  Notably, Plaintiffs do not even go so far as to allege that these are *all* trade secrets; they instead characterize this list as "Plaintiffs' confidential, proprietary and/or trade secret information."  Compl. ¶ 46.  Other descriptors in the Complaint of allegedly misappropriated documents include "proprietary market research and business and development plans"; documents that detail "negotiations among the Sapir Organization and its lenders, outside investors and the seller, and reveal the complex ownership, investment and financing structure that allows for profitability and the liquidity necessary to develop, manage and carry the property"; as well as documents that detail "extensive negotiations, pricing information, and deal and investment structures and strategies." *Id.* ¶¶ 48, 51, 70.  Defendants object on the basis of both substance and form: they argue that "knowledge of the intricacies of a business and its financials" is not a trade secret, *Flatiron Health, Inc. v. Carson*, No. 19 Civ. 8999 (VM), 2020 WL 1320867, at *26 (S.D.N.Y. Mar. 20, 2020), and that Plaintiffs' assertion of "general categories of confidential information" fails to plead trade secrets with sufficient specificity, *Elsevier*, 2018 WL 557906, at *6.  Omer MTD at 13; Rotem MTD at 18-20.  The Court agrees.

Perhaps most importantly, Plaintiffs fail to plead *which* of the numerous categories of documents they describe in their Complaint are trade secrets—as opposed to mere confidential or

proprietary information.  Plaintiffs' heavy reliance on the "and/or" construction, Compl. ¶¶ 46, 53, "conflates the concept of a trade secret with confidential information." *Elsevier*, 2018 WL 557906, at *6.  Such a strategy does not assist the Court in discerning which subsets of this universe of documents are alleged to be trade secrets because "not all confidential information is considered a protected trade secret." *Par Elec. Contractors, Inc. v. Atkins*, No. 8:05-CV-1409 (GLS/DRH), 2007 WL 2713012, at *5 n.13 (N.D.N.Y. Sept. 14, 2007).  This pleading deficiency alone is fatal to Plaintiffs' claim: the Court cannot meaningfully assess the protectability of the documents described in the Complaint without first knowing which of the documents must be assessed for that protectability.

Even if the Court were to liberally construe the Complaint as alleging that *all* the listed documents were trade secrets, such that the Court's task was somewhat clear, Plaintiffs would still fail to state a claim.  As an initial matter, much of the information alleged to (possibly) constitute trade secrets is information about the corporate structure or financial affairs of Plaintiffs and their affiliates, or about Plaintiffs' previous contracts with other parties.  Trade secrets generally consist of information that is developed or compiled by the owner of the secrets.  *See, e.g.*, *DFO Glob. Performance Com. Ltd. (Nevada) v. Nirmel*, No. 20-CV-6093 (JPO), 2021 WL 3475596, at *4 (S.D.N.Y. Aug. 6, 2021).  Plaintiffs cannot simply allege to have developed or compiled their own "assets and liabilities," their own past contracts and negotiations, or their own "complex ownership, investment and financing structure that allows for profitability," and turn them into trade secrets through that allegation alone.  This instead appears to be mere data about "the intricacies of a business and its financials." *Flatiron*, 2020 WL 1320867, at *26.  *Accord Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (N.Y. App. Div. 1985).  Nor do Plaintiffs allege or argue that contracts and organizational

documents that are common to many a business are unique, either in substance or in compilation; they appear instead to assume that the mere success of the Sapir Organization's business proves the uniqueness of their internal documents.  *Cf. Sit-Up Ltd.*, 2008 WL 463884, at *10 ("Rather, [plaintiff] would have the Court infer that, because it ran a successful falling-price auction business, its combination of various, possibly secret, data and business protocols must have been unique.").

Yet another deficiency to Plaintiffs' trade secret allegations is that many of the documents listed in the Complaint—including all the "loans," "agreements," and other contracts—are documents that were necessarily shared with at least one other party.  Disclosing a trade secret "to others who are under no obligation to protect the confidentiality of the information" ultimately "extinguishe[s]" that property right.  *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016).  *See Elsevier*, 2018 WL 557906, at *4 ("The extent of measures taken by the business to guard the secrecy of the information is only one factor in [the trade secret] analysis, [but] it is the most critical one.").  Indeed, such documents could not have "independent economic value, actual or potential," without being known by "another person," namely, the other party or parties to the contract.  18 U.S.C. § 1839(3).  Plaintiffs, for the most part, fail to rebut this conclusion, such as by alleging that every time they shared these contracts with the other parties to the various loans and agreements, they imposed on them strict obligations to maintain their confidentiality.[4]  These observations apply to the vast majority of the documents Rotem allegedly used in his competing real estate transactions.  Compl. ¶¶ 70-74 (asserting that Rotem misappropriated various agreements

---

[4] While some of the alleged trade secrets listed include "confidential settlement documents," *see, e.g.*, Compl. ¶ 72, which would presumably be circulated under such an obligation to maintain confidentiality, Plaintiffs fail to explain how even these documents derive independent economic value by virtue of being unknown to others, as opposed to by virtue of the benefits that flow from a settlement agreement.

between Sapir Organization entities and "lenders, outside investors and the seller"; loan

documents; and correspondence between the Sapir Organization and a potential developer).

Given the fact that many of the documents described in Plaintiffs' Complaint were, by definition,

shared with other parties, Plaintiffs' bare assertion that these documents are protected trade

secrets is implausible—whether or not they were also stored on a secure database or governed by

confidentiality agreements.  Cf. *Pauwels v. Deloitte LLP*, No. 19-CV-2313 (RA), 2020 WL

818742, at *5 (S.D.N.Y. Feb. 19, 2020) (plaintiff did not plead existence of trade secrets when

he shared information with a third party without alleging a "formal agreement" with that third

party regarding the information's confidentiality or any limitations on who within or outside the

third-party organization could see the information).

Setting aside the bulk of documents that are clearly unprotected leaves some scattered

references and phrases in Plaintiffs' Complaint that might conceivably describe trade secrets,

such as "proprietary formulas and methods for in-house development, construction, management

and financing"; "pricing information"; or "deal and investment structures and strategies."

Compl. ¶¶ 47, 48, 51.  *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (noting that

"propriety data relating to pricing, costs, systems, and methods" is a trade secret); *Flatiron*, 2020

WL 1320867, at *26 (noting that "strategic business information" is a trade secret).  But, as

noted above, Plaintiffs have not actually alleged that these particular documents are trade secrets

as opposed to merely confidential.  Even granting them this reading, these descriptors are so

general that the Court is unable to infer either the existence or the protectability of any trade

secret.

"To survive a motion to dismiss, a party alleging that it owns a trade secret must put forth

*specific* allegations as to the information owned and its value."  *Elsevier*, 2018 WL 557906, at *4

(emphasis added).  This requirement exists both so that defendants are put on notice of what items they allegedly misappropriated and so that a court can ascertain the protectability of the information at issue.  *Fowler*, 2019 WL 3004161, at *4; *Sit-Up Ltd.*, 2008 WL 463884, at *10. None of Plaintiffs' allegations meet this standard.  Take, for instance, Plaintiffs' reference to "pricing information."  The Court is left to wonder: Pricing information for which products or services?  With respect to which types of purchasers?  Do Plaintiffs allege that *every* pricing decision they make is a trade secret, or only for certain especially sensitive projects or items?  *Cf. Medidata Sol., Inc. v. Veeva Sys., Inc.*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *9 (S.D.N.Y. Feb. 9, 2021) (concluding that a description of "company-wide business plans" was so broad that it would be "impossible to discern . . . what specific items relating to [the] overall business plans constitute the claimed secrets").  To use another example, Plaintiffs' mere invocation of "propriety formulas and methods" is insufficient without an explanation of "how those methods [and] processes . . . function," or the purpose for which they are used.  *Elsevier*, 2018 WL 557906, at *6.  *Cf. id.* ("Even [a party's] most specific assertion—its 'ontology process and tools, including [its] unique and proprietary process for "binding" collecting original terms in a publication and then binding the like terms and synonyms to that original term'—does not plausibly support the existence of a true trade secret.").  Thus, even narrowing the wide-ranging scope of documents referenced in the Complaint to the ones potentially deserving of protection, Plaintiffs' pleadings still do not come close to defining "the contours of a trade secret."  *Id.*  If Plaintiffs' strategy was to use as broad a vocabulary as possible in the hopes that some terminology would hit upon a trade secret definition, this strategy backfired, because it prevents Defendants and the Court from meaningfully discerning the protectability of specific documents

or information and the uniqueness of their compilation.  *See Sit-Up Ltd*, 2008 WL 463884, at *10.

Presented with a haystack of items in which potential trade secrets may lurk, the Court declines Plaintiffs' invitation to go searching for the theoretical needle.  Accordingly, Plaintiffs' DTSA claim is dismissed.

## II.    Plaintiffs' Remaining State Law Claims Are Dismissed

Pursuant to 28 U.S.C. § 1367(c)(3), "a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction."  *Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006).  Although declining to exercise supplemental jurisdiction in such a case is not "absolutely mandatory," *Marcus v. AT&T Corp*., 138 F.3d 46, 57 (2d Cir. 1998), in "the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  As the Court is dismissing the only one of Plaintiffs' eleven claims that arises under federal law, the Court declines to exercise supplemental jurisdiction over the state law claims and dismisses them, albeit without prejudice.  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 119 (2d Cir. 2006); *Anderson v. New York City Dep't of Fin.*, No. 19-CV-7971 (RA), 2020 WL 1922624, at *10 (S.D.N.Y. Apr. 21, 2020) ("Because the Court . . . dismissed [the federal]

claims early in the litigation, declining jurisdiction over the remaining state . . . claims would not disserve the principles of judicial economy, convenience, or fairness.").

III.     **Leave to Amend Is Granted**

"Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint."  *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-CV-7840 (RA), 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021).  The Court will grant Plaintiffs such leave here, to the extent they can do so in good faith to attempt to meet the pleading standard on their federal claim.  Plaintiffs may amend their Complaint on or before October 28, 2021.  Failure to file an amended Complaint by that date will result in dismissal of this action with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss.  The Clerk of Court is respectfully directed to terminate the items at docket numbers 29 and 34.

SO ORDERED.

Dated:        September 30, 2021
              New York, New York

_____

Ronnie Abrams
United States District Judge